UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HOV SERVICES, INC.,<br><br>                    Plaintiff,<br><br>          -v-<br><br>ASG TECHNOLOGIES GROUP, INC.,<br><br>                    Defendant. | Civil Action No.  18-cv-9780<br><br><br>**COMPLAINT** |

Plaintiff HOV Services, Inc. ("HOV"), by and through its undersigned counsel, as and for its Verified Complaint herein, alleges as follows:

## PARTIES AND JURISDICTION

1.      HOV is a Delaware corporation with its principal place of business in Irving, Texas.  HOV is authorized to do business and regularly does business in the State of New York.

2.      On information and belief, Defendants ASG Technologies Group, Inc. ("ASG") is a Delaware corporation with its principal place of business in Naples, Florida.   On further information and belief, ASG is authorized to do business and regularly does business in the State of New York.

3.      ASG is subject to personal jurisdiction in the Southern District of New York because, on information and belief, it is authorized to do and regularly does business in the State of New York, maintains offices in this judicial district, including at 287 Bowman Ave. #401, Purchase, NY, 10577, and committed illegal acts within this district and within this state, as described below.

4.     This Court has federal question jurisdiction under 28 U.S.C. § 1331, because HOV brings claims arising under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*

5.     In addition, plaintiff's claim is brought under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2210 & 2202.

6.     Venue is proper within this district, the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(b)(1), because ASG is a resident of this judicial district as a result of it being subject to the Court's personal jurisdiction with respect to this action and, alternatively, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to these claims occurred within this district.

## THE UNDERLYING FACTS

### The Parties and Their Relationship

7.     HOV provides enterprise information management and transaction processing services in the business process outsourcing industry.  HOV is a global Transaction Processing Services (TPS) and Enterprise Information Management (EIM) leader, providing services and solutions for high-volume, mission-critical organizations seeking to drive efficiency with their business processes.  HOV is a wholly-owned subsidiary of  SourceHOV, Inc., which is one of the companies comprising Exela Technologies, a solutions provider for financial technology and business services.

8.     On information and belief, ASG is formerly known as Allen Systems Group, Inc. and is the successor in interest to Mobius Management Systems, Inc. ("Mobius").  At the time of the initial License Agreement at issue here, Mobius was located at 120 Old Post Road, Rye, New York 10580.

9.     ASG is a provider of Enterprise Information Management and IT System Management solutions technology.  ASG boasts on its website that it has more than 3,000 customers worldwide in 60 countries and in markets including Healthcare, Financial Services, Insurance and Government.  https://www.asg.com/Aboutus.aspx.

10.     On or about December 19, 2005, HOV's predecessor, Lason Systems, Inc. ("Lason"), and ASG's predecessor, Mobius, entered into the License Agreement, through Mobius provided to Lason a non-exclusive license for the use of certain computer software components together known as the "Mobius System."

11.     HOV provides outsourced data center services and proprietary workflow for its customers to retain and access large amounts of electronic data.  The Mobius System is an electronic toolkit integrated into HOV's systems; it allows HOV's customers' various forms of data to be ingested and converted into certain formatted documents, which are subsequently stored in HOV's data center, and allows them to be retrieved on demand.  Customers can access their data and documents 24/7 through HOV's systems and the Mobius System engine.  The documents converted through the Mobius System and stored on HOV's systems are formatted in ASG's proprietary format and thus are virtually inaccessible to HOV and HOV's customers without the Mobius System.  Currently, HOV uses the Mobius System to process data for up to 75 U.S. customers.  As it stores some sensitive and business-critical data for its customers, HOV's ability to provide its customers with uninterrupted and on-demand access to their data is absolutely necessary for its business.

12.     Pursuant to its Section 20(C), the License Agreement is "governed by the laws of the State of New York."

13.     The initial pricing for the License Agreement was set forth in its "Exhibit A," also dated December 19, 2005.  Under Exhibit A, the "Total Fee" was $912,530.00 for a five-year term.

14.     In 2010, the License Agreement was renewed.  Pursuant to "Exhibit B" to the License Agreement, entered into as of September 30, 2010, Allen Systems Group, Inc. (as successor to Mobius) licensed the Mobius System to HOV (as successor to Lason) for another five-year term (the "2010 License Renewal").

15.     As set forth in Exhibit B, the "Total Fee" for the five-year term was $800,000.00, broken down as follows:

- For the First Year, a License Fee of $136,000.00 and a Maintenance Fee of $24,000.00, payable in four equal installments over the course of the year.

- For the Second Year, a License Fee of $160,000.00, payable in four equal installments over the course of the year (with maintenance services available for $24,000.00, paid over the course of the year).

- For the Third Year, a License Fee of $160,000.00, payable in four equal installments over the course of the year (with maintenance services available for $24,000.00, paid over the course of the year).

- For the Fourth Year, a License Fee of $160,000.00, payable in four equal installments over the course of the year (with maintenance services available for $24,000.00, paid over the course of the year).

- For the Fifth Year, a License Fee of $160,000.00, payable in four equal installments over the course of the year (with maintenance services available for $24,000.00, paid over the course of the year).

16.    The licensing fees agreed to under the 2010 License Renewal were slightly modified by "Exhibit C," effective as of December 30, 2011, in which the parties agreed to add additional functions to the License Agreement and that an additional Total Fee, in the amount of $88,920.00, would be paid over the next four years in a series of installments.

17.    In 2015, the License Agreement was renewed again. Pursuant to "Exhibit D" to the License Agreement, entered into as of September 30, 2010, Allen Systems Group, Inc. licensed the Mobius System to HOV (as successor to Lason) for a three-year term (the "2015 License Renewal"), running from September 30, 2015 through September 29, 2018 (the "Term").

18.    As set forth in Exhibit D, the "Total Fee" for the Term was $534,501.00, broken down as follows:

- For the First Year, a License Fee of $169,917.00 and a Maintenance Fee of $24,750.00, payable in four equal installments over the course of the year.

- For the Second Year, a License Fee of $169,917.00, payable in four equal installments over the course of the year (with maintenance services available for $24,750.00, paid over the course of the year).

- For the Third Year, a License Fee of $169,917.00, payable in four equal installments over the course of the year (with maintenance services available for $24,750.00, paid over the course of the year).

**The 2018 Renewal Discussions**

19.    In September 2018, ASG and HOV began negotiations for an extension of the License Agreement. The renewal that HOV sought did not require any new installation, new

technology or other new services, and was intended solely to extend HOV's use of the Mobius System that it had been using since 2005 for another three years. Accordingly, based on the parties' long-standing prior course of dealing, HOV reasonably expected that the renewal would be non-contentious and on terms commercially similar to, and in line with, the two prior renewals and that the renewal negotiations would be able to be concluded in time to prevent any disruption to its customers' ability to access their business-critical data.

20.     ASG had different plans, however. With full knowledge that the 2015 License Renewal was set to expire on September 29, 2018, and that HOV was particularly vulnerable because HOV could not replace the Mobius System before the license expired, ASG demanded that HOV agree to renewal terms that were dramatically different than the parties' prior renewals or ASG would terminate HOV's access to the Mobius System, thereby precluding HOV's customers from accessing their business-critical data.

21.     ASG knew, or had reason to know, that HOV's goodwill and customer relationships are predicated, in part, on HOV's ability to provide uninterrupted access to its customers' business-critical data and that any interruption to access would be detrimental to HOV's business. HOV's customers include healthcare insurance companies who store and access documents to determine claims, staffing companies that store and access employee time records for payroll, doctors who transmit and store insurance claims, and various companies that store invoices to be processed for payment. Immediate access to their data is critical for customers such as these.

22.     Attempting to exploit this imbalance in bargaining leverage, ASG initially demanded that HOV agree to an 11x price increase (over the 2015 License Renewal) for continued access to the Mobius System, which totaled $5,954,688.00, comprised of a License

Fee of $5,582,520.00 for a three-year period, along with annual Maintenance Fees totaling $372,168.00.  There was no good-faith basis for ASG's exorbitant demand.

23.    HOV tried to push back and rejected the price increase as commercially unreasonable.  In a good-faith attempt to further the renewal negotiations and continue with the parties' long-standing business relationship, HOV counter-proposed adjustments to certain terms with the hopes that those changes would bring the renewal pricing in line with its reasonable expectations (based on the parties' prior course of dealing).  For example, HOV informed ASG that the number of licenses ASG sought to require HOV to purchase was "significantly above what Exela has requested or needs to run its business."  Nonetheless, ASG unreasonably rejected HOV's efforts to decrease the number of licenses needed or the number of servers on which HOV would use the Mobius System.  Moreover, ASG would not consider a shorter licensing term than what it demanded.

24.    Rather than attempting to negotiate with HOV in good-faith to secure the renewal, ASG persisted with its extortionist tactics.  To ratchet up pressure on HOV, ASG demanded that the parties reach a new agreement by September 28, 2018—a full day before the 2015 Renewal License was set to expire—otherwise ASG would prematurely terminate HOV's access to the Mobius System.  There was no commercially valid reason for ASG to terminate HOV's access to the Mobius System a day early; instead, the threatened shutdown was intended solely to exert undue pressure on HOV in order to get HOV to capitulate to ASG's demands.

25.    In response, HOV informed ASG that it could not "afford interruption to [its] critical systems and [had] no choice but to consent to [ASG's] extortionate terms."  HOV added that "ASG has put Exela in an unconscionable situation by increasing the price exorbitantly without any basis or explanation on the eve of the current agreement expiring, on September 29,

2018. ASG and Exela have [had a] relationship for about 15 years and it is shocking to go through this type of negotiation, a negotiation which in essence holds Exela's businesses hostage."

26.    Reasonably believing that ASG fully intended to follow through with its threat to terminate HOV's access to the Mobius System, HOV reluctantly agreed on September 28, 2018, to a five-year license renewal that cost HOV $500,000 per year.

27.    After surrendering to ASG's demands, HOV requested an updated license key from ASG, which was necessary in order to avoid the September 28th system shutdown that ASG had set in motion prior to HOV acquiescing.

28.    Rather than providing the necessary updated software key, ASG continued to use the impending shutdown as improper leverage against HOV.  In particular, ASG did not provide the updated software key as requested, but rather turned its efforts toward drafting and executing "Exhibit E" of the renewal (the new fee schedule for the License Agreement), which it sent to HOV for the first time only less than two hours before HOV's access to the Mobius System was set to be improperly terminated at midnight.

29.    Given that HOV already had submitted to ASG's unreasonable terms in order to insure its customers continued to have uninterrupted access to their business-critical data, there was no valid business reason for ASG to demand that the parties execute Exhibit E before ASG provided the updated software key.  The parties had a 15-year relationship; it was (or should have been) clear to ASG from the parties' prior course of dealing that finalizing the fee schedule was a mere formality.

30.    After receiving Exhibit E, it immediately became painfully obvious to HOV why ASG was focusing on the fee schedule now rather than getting it the updated software key.  The

fee schedule reflected terms that were different than what HOV thought it had unwillingly agreed to. The initial draft of Exhibit E only provided for maintenance services in 2018 and 2019, requiring payments above the $500,000 per year for maintenance in other years (ASG subsequently revised the fee schedule to include maintenance for all years in the $500,000 per year price). Moreover, the draft required the entire $2.5 million to be paid up front upon issuance of an invoice by ASG.

31.    Frantically working to avoid the impending system shutdown, HOV returned a redlined version of Exhibit E to ASG less than 45 minutes after receiving the initial draft, and informed ASG again that it needed the updated software key to avoid the system shutdown that was scheduled to automatically occur in an hour or so. Incredibly, ASG even refused to provide HOV with a temporary software key that would ensure HOV had continued access to the Mobius System throughout the full Term of the then-current License Agreement—*i.e.*, September 29, 2018. HOV advised ASG that the system going down at midnight would be "very very risky."

32.    At 11:30 p.m. EDT, ASG returned another draft of Exhibit E, but remained silent on the updated software key. Notably, the draft fee schedule that ASG sent back to HOV omitted all of HOV's proposed changes with no explanation whatsoever and, further, was not even redlined to indicate to HOV terms that had changed.

33.    HOV's access to the Mobius System was terminated 30 minutes later, at midnight. Thus, on September 28, 2018, a full day before the existing Term expired, in an effort to force HOV to capitulate to the proposed, commercially unreasonable terms, *ASG shut down HOV's use of the Mobius System*, disrupting HOV's operations and blocking HOV customers from being able to access their business-critical data from HOV's servers.

34.     HOV immediately advised ASG that the system was down.  But ASG did not restore service.  Instead, at 12:07 a.m. EDT, ASG sent yet another draft of Exhibit E that failed to reflect any of HOV's proposed changes and language without any explanation.

35.     At 1:01 a.m. EDT, HOV reported to ASG: "System is still down.  Severe operations impact.  No ETA for license keys."  A few minutes later, HOV emailed ASG again: "We need urgent call.  We cannot continue to be down."

36.     ASG ignored those emails, and simply sent yet another updated draft of Exhibit E.

37.     Shortly thereafter, ASG finally sent a "trial license" to HOV, but that was insufficient to fully restore the system, as HOV promptly told ASG.  HOV requested a production license and stated to ASG: "Our systems are down and we have an operational impact."

38.     At 1:30 a.m. EDT, ASG emailed to ask if its latest "changes are acceptable."

39.     At 1:35 a.m. EDT, ASG emailed HOV, stating (incorrectly) that there was no difference between the "Eval Keys" (another term for "trial license") and the "Prod Keys" (which are full production keys necessary to run the system in its entirety).  In the same email, ASG stated: "When the contract is signed you will receive 30 day keys immediately. This will allow us to complete the contract, PO and invoicing process.  Then we will issue keys for the term of the agreement."

40.     HOV informed ASG again that the trial license ASG provided was insufficient to restore HOV's full access to the Mobius System and HOV's customers full access to their business-critical data.

41.     At 1:52 a.m. EDT, ASG emailed HOV:  "As soon as we receive and validate a signed Product Schedule we will send an email with a production ready 30 day license key and

we will open our ISP for Emergency key download which is also a production ready 30 day key. That is our standard process for every customer." On information and belief, the reference to ASG's "standard process" was simply pretext for ASG to continue holding HOV's business hostage until HOV executed ASG's version of Exhibit E.

42.    Realizing that ASG would not restore access until it executed ASG's version of the fee schedule, HOV had no choice but to sign Exhibit E as-is. HOV emailed ASG a signed version of Exhibit E at 1:59 a.m. EDT.

43.    ASG subsequently rejected the version of Exhibit E that HOV signed and returned, and sent to HOV yet another version of Exhibit E, which was signed by ASG, at 2:20 a.m. EDT.

44.    The parties continued to exchange emails concerning Exhibit E throughout the early morning and also conferred on a conference call to address, among other things, the payment structure for the renewal. Consistent with the two prior renewals, HOV reasonably expected to make quarterly payments over the full term of the renewal, but ASG – for the first time in the 13-year relationship of the parties – demanded the full amount of the renewal be paid up front.

45.    Following the parties' conference call, Chuck Neal, ASG's EVP for Global Sales & Services, sent an email to HOV at 3:30 a.m. EDT to let HOV know, among other things, that ASG (finally) had provided HOV with a full production license, but that the license was only temporary and would expire again at midnight on September 29, 2018, unless HOV accepted ASG's proposed terms, including the upfront payment. Neal explicitly stated that this was ASG's "best and final offer."

46.    In regard to annual payments, Neal stated falsely that "[c]onsistent with your previous agreements and with our software contracts, invoicing and payment is due upfront." In fact, up front invoicing was a complete deviation and departure from the parties' prior agreements and course of conduct.

47.    Neal also stated in his email: "We are not a bank and are not able to offer financing. Our customers who require financing use companies like IGS or financial institutions where they have established relationships and lines of credit." Again, the idea that HOV would need to pursue a line of credit to pay ASG's license fee up front was a complete deviation and departure from the parties' prior agreements and course of conduct.

48.    In its histrionics and bad faith over the course of these communications, ASG made it plain that, unless HOV agreed to terms satisfactory to ASG, the Mobius System would be taken down again. As indicated above, ASG responded to repeated emails from HOV about the outage (both before and after it began) by continuing to send draft agreements and otherwise insist on the execution of a final agreement.

49.    Still reeling from the first shutdown and having no desire to deal with another one, HOV begrudgingly signed "Exhibit E", which provides that ASG will license the Mobius System to HOV for a five-year term, running from September 30, 2018, through September 29, 2023 (the "New Term"). As set forth in Exhibit E, the Total Fee for the New Term is $2,500,000.00, broken down as a License Fee of $2,075,000.000 and Maintenance Fees of $425,000.00. While Maintenance Fees were optional in the prior renewals, ASG required, because it could, that they be fully paid at the start of the New Term with no refund option for HOV in the event HOV did not utilize the paid-for services (as was the parties' prior course of dealing).

50.    For reference, **Table 1** below shows the key terms and payment schedules for the various renewals:

| | 2010 License Renewal | 2015 License Renewal | 2018 License Renewal |
|---|---|---|---|
| **Licensing Term** | 5 years | 3 years | 5 years |
| **Licensing Fee ("LF")** | $776,000 | $509,751 | $2,075,000 |
| **Maintenance Fee ("MF")** | $24,000 | $24,750 | $425,000 |
| **Payment Schedule** | Year 1: $136,000 (LF) $24,000 (MF) Year 2: $160,000 Year 3: $160,000 Year 4: $160,000 Year 5: $160,000  *Each year's total fee was payable in equal quarterly installments | Year 1: $169,917 (LF) $24,750 (MF) Year 2: $169,917 Year 3: $169,917  *Each year's total fee was payable in equal quarterly installments | Year 1: $2,075,000 (LF) $425,000 (MF)  *The total fee was payable upon 30 days of receiving ASG's purchase order |

Table 1

51.    HOV again made it clear to ASG that it was signing Exhibit E only because it was "forced to enter into these terms to resume production" and that the licenses being provided were "significantly above what [HOV] has requested or needs to run its business."

52.    And, in an email at 1:01 p.m. EDT on September 29, Excela's General Counsel restated that the license renewal HOV was forced to enter into deviated substantially from the parties prior course of dealing and that HOV acquiesced to ASG's demands only because it had no other option: "It was our expectation that we would pay for the license each year. Or at a minimum consistent with the terms and practice of the agreements in place over the last 13 years – quarterly payments. This offer you reference above does not reflect our conversation. I proposed an overall deal of $1.5M for 3 years, which you denied. You are now forcing us for the first time to accept a new payment term that requires the advanced payment of $2.5M. Again, rather than negotiate in good faith, you are forcing us to accept this term in order to keep our production environment active."

53.     Upon HOV's final capitulation, ASG provided a 30-day Production License Key that is valid through October 29, 2018, which is when the upfront payment is due.

54.     By purporting to accept ASG's demands, HOV was able to reconnect its customers with their business-critical data.   Nonetheless, HOV received complaints from its customers regarding the outage.   In the course of trying to maintain its customers' continued access to their data, HOV has suffered losses of at least $5,000 in value.

55.     Moreover, as a result of ASG's deliberate and improper shutdown of HOV's systems on September 28th (done, on information and belief, solely to gain improper bargaining leverage), HOV faces a loss of goodwill, which currently is not calculable.

**HOV's Path Forward**

56.     On October 2, 2018, ASG sent an "Invoice" to HOV, seeking payment of $2,500,000 for a new "Term" from September 29, 2018 through September 28, 2013.

57.     In light of ASG's unconscionable, opportunistic and downright extortionist conduct, HOV appreciates that there is a substantial business risk if it were to continue to rely on ASG's software.   Accordingly, at great expense, HOV is in the process of transitioning to replacement software, while avoiding any disruption to its customers' access to date. The cost of this transition will greatly exceed $5,000 and is necessary to protect the security of HOV's systems and its customers' continued access to their data.

**ASG's Modus Operandi**

58.    As HOV since has learned, it does not appear that ASG's bad-faith conduct during the course of the renewal negotiations is an isolated incident. Indeed, it appears that ASG (and its predecessor-in-interest, Mobius) has a history of using similar strong-arm tactics to push unreasonable pricing terms on its customers.

59.    For example, on information and belief, ASG currently is a defendant in a case pending in the United States District Court for the Western District of Texas captioned *McLane Company, Inc. v. ASG Technologies Group, Inc.*, No. 6:17-cv-00166 (W.D. Tex.). In its Second Amended Complaint, Application for Declaratory Judgment and Application for Injunctive Relief (the "McLane Complaint"), plaintiff, McLane Company, Inc. ("McLane"), alleges that, during the course of its software license renewal negotiations, ASG wrongly claimed that McLane had exceeded the scope of its prior licenses and improperly tried to use that alleged unauthorized usage as a basis to increase the cost of the license renewal by "more than 100%" than the previous five-year renewal term (from $2,489,907 to $5,012.778). (*See* McClane Compl. at ¶ 26.) Indeed, like here, McLane considered the renewal cost to be "exorbitant" and a clear demonstration "that ASG intend[ed] to charge excessive rates to renew the right for McLane to use software that has been deeply embedded and relied upon by McLane and its customers for many years". (*Id.*)

60.    Further, similar to what ASG did with HOV, McLane alleges that ASG set "an arbitrary deadline that a renewal agreement with the new fees had to be executed" by McLane months before the parties' then-existing agreement expired (id. at ¶ 27) otherwise ASG threatened to terminate McLane's access to ASG's software prior to the contractual expiration date (*see id.* ¶¶ 28-31), even though ASG's software was critical to McLane's business and early

termination of the license "by turning off McLane's software key . . . would [have been] catastrophic to McLane's day-to-day operations, as well as to the operations of its customers" (*id.* at ¶ 34).

61.     ASG also was a defendant in a case that was pending in the United States District Court for the Middle District of Tennessee captioned *Nissan North America, Inc. v. ASG Technologies Group, Inc.*, No. 3:16-cv-02630 (M.D. Tenn.).  Plaintiff in that case, Nissan North America, Inc. ("Nissan"), alleges in its Verified Complaint for Injunctive Relief (the "Nissan Complaint") that it (similarly) had a long-standing relationship with ASG during which numerous license extensions were agreed to "without difficulty and without extensive formal negotiations".  (Nissan Compl. at ¶ 18.)  However, during the course of what Nissan thought would be routine renewal negotiations, ASG demanded a 20x increase over the parties' prior three-year renewal just 20 days before the then-existing license was set to expire.  (*Id.* at ¶ 19.) Nissan further alleges that it refused ASG's "outrageous proposal" and, instead, "proposed that ASG consent to a brief extension of the License Agreement so that [Nissan] could locate and transition to a new software provider".  (*Id.* at ¶ 20.)  ASG "refused" Nissan's request for a brief extension (*id.* at ¶ 21), notwithstanding that ASG knew Nissan's "use of, and access to, the software [was] critical to [Nissan's] business" (*id.* at ¶ 25).  Nissan was forced to sue ASG to enjoin temporarily ASG from terminating access to the licensed software while Nissan located and transitioned to a new software provider.  On information and belief, ASG settled this matter with Nissan.

62.     ASG's predecessor-in-interest, Mobius, was a defendant in a case brought in the United States District Court for the District of Puerto Rico captioned *Puerto Rico Telephone Co. v. Mobius Management Systems, Inc.*, No. 3:06-cv-02121 (D. P.R.).  Plaintiff, Puerto Rico

Telephone Co. ("PRTC"), alleges in its Verified Complaint (the "PRTC Complaint") that it licensed from Mobius certain software that "serve[d] a crucial function to its operations". (PRTC Compl. at ¶ 12.) According to the PRTC Complaint, about a week before certain of PRTC's licenses were set to expire (*see id.* at ¶ 13), Mobius tried to get PRTC to agree to a new licensing arrangement that was "onerous and unrealistic given the parties' current contracts and customary dealings" (*id.* at ¶ 20). In particular, PRTC alleges that Mobius "unreasonably condition[ed] the renewal of [one software] license on the payment of exorbitant amounts of money or the renegotiation of most of the current license agreements and the purchase of unwanted products" (*id.* at ¶ 25) and that Mobius demanded that PRTC stop using the licensed software immediately unless PRTC agreed to Mobius' take-it-or-leave-it terms (*id.* at ¶ 29) even though Mobius' software was necessary to run PRTC's business. PRTC had to seek injunctive (as well as other) relief from the court. On information and belief, PRTC and Mobius eventually reached a settlement.

63.     Accordingly, it appears that ASG (including its predecessor-in-interest, Mobius) has a history of bad-faith, coercive and predatory negotiation tactics. Given that, it is clear that ASG's conduct here was not in good-faith, but rather was intended to take advantage of HOV; to inflict economic duress on HOV; to interfere with HOV's business, including HOV's customer relationships, and to breach its contractual obligations with HOV, including its duty of good-faith and fair dealing. Along the way, ASG also violated federal statures by interfering with HOV's servers and other protected computers.

64.     By this action, HOV seeks to preclude ASG from further misconduct, to rescind the improperly obtained Exhibit E renewal and to recover appropriate compensatory and punitive

damages (as well as HOV's attorney's fees and expenses) arising from ASG's outrageous behavior.

## FIRST CAUSE OF ACTION

### (Computer Fraud and Abuse Act)

65.     HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

66.     HOV's servers constitute "computers" under 18 U.S.C. § 1030(e)(1).

67.     HOV's servers and computer systems are used in interstate commerce, and therefore constitute "protected computers" under 18 U.S.C. § 1030(e)(1).

68.     ASG's intentional shutdown of HOV's systems on September 28 and 29, 2018 constituted one or more violations of 18 U.S.C. § 1030(a)(5), because ASG knowingly caused the transmission of a command and, as a result of such conduct, intentionally caused damage without authorization to HOV's protected computers.

69.     ASG's demands that HOV agree to commercially unreasonable terms, coupled with ASG's intentional shutdown of HOV's systems on September 28 and 29, 2018, constituted one or more violations of 18 U.S.C. § 1030(a)(7), because ASG, acting with intent to extort from HOV money, transmitted in interstate commerce threats to damage HOV's protected computers, along with demands for money in relation to damage to a protected computer, where such damage was caused to facilitate the extortion.

70.     As a direct and proximate result of the above-described violations, HOV suffered monetary damages exceeding $5,000, including direct costs of dealing with ASG's shutdown, resulting losses anticipated from customers demanding penalty payments and/or from a loss of business, the costs of entering into Exhibit E, should it prove to be legally enforceable (which, as

set forth below, HOV disputes), and the costs of transitioning to the Substitute System in order to protect HOV's systems and its customers' data.     Accordingly, HOV has suffered loss aggregating at least $5,000 in value, entitling HOV to pursue a private right of action under 18 U.S.C. §§ 1030(c)(4)(A)(i)(I) and 1030(g).

71.     Pursuant to 18 U.S.C. § 1030(g), HOV is entitled to equitable relief and compensatory damages.

72.     HOV seeks a declaration pursuant to 28 U.S.C. § 2201 that ASG's conduct constitutes one or more violations of 18 U.S.C. §§ 1030(a)(5) and/or 1030(a)(7) of the Computer Fraud and Abuse Act.

73.     As a direct and proximate result of ASG's misconduct described herein, HOV has suffered monetary damages, but it has no adequate remedy at law for the full extent of harm caused by the shutdown of the Mobius System and would be irreparably injured by any further shutdown.  HOV will be successful on the merits of this action.

## SECOND CAUSE OF ACTION

### (Stored Communications Act)

74.     HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

75.     ASG's intentional shutdown of HOV's systems on September 28, 2018 constituted one or more violations of 18 U.S.C. § 2701, because ASG intentionally accessed HOV's electronic facilities that provide electronic communication services and, exceeding ASG's authorization, altered and/or prevented access to data and electronic communications.

76.     Pursuant to 18 U.S.C. § 2707, HOV is entitled to equitable relief, compensatory damages, and its reasonable attorney's fees and other litigation costs.  HOV also entitled to

punitive damages, because ASG's violation of the Stored Communications Act was willful and/or intentional.

77.    HOV seeks a declaration pursuant to 28 U.S.C. § 2201 that ASG's conduct constitutes one or more violations of 18 U.S.C. § 2701 of the Stored Communications Act.

78.    As a direct and proximate result of ASG's misconduct described herein, HOV has suffered monetary damages, but it has no adequate remedy at law for the full extent of harm caused by the shutdown of the Mobius System and would be irreparably injured by any further shutdown.  HOV will be successful on the merits of this action.

## THIRD CAUSE OF ACTION

### (Breach of Contract)

79.    HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

80.    The License Agreement, along with Exhibit D, is a valid, legally enforceable contract.

81.    HOV substantially performed all of its obligations under the License Agreement.

82.    Pursuant to the License Agreement and Exhibit D, ASG was required to provide continuing access to the Mobius System through and including September 29, 2018.

83.    ASG breached the License Agreement by shutting down HOV's access to the Mobius System on September 28 and 29, 2018.

84.    ASG intentionally breached the License Agreement, solely to pressure HOV into agreeing to commercially unreasonable terms for an extension.  This was a material breach of ASG's obligations.

85.     As a direct and proximate result of ASG's breach, HOV has suffered and will suffer monetary damages, including without limitation any amounts it agreed to pay ASG to reinstate service.

## FOURTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

86.     HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

87.     The License Agreement, along with Exhibit D, is a valid, legally enforceable contract.

88.     As such, the License Agreement and Exhibit D imposed upon the parties thereto a duty of good faith and fair dealing in the performance and enforcement of such contract.

89.     Under the circumstances here, ASG's duty of good faith and fair dealing included the obligation to negotiate an extension of the License Agreement in good faith. The parties had been operating under the License Agreement and its predecessors for 13 years. Both knew that HOV's continuing use of the Mobius System was intended as an essential component of HOV's business, and that HOV reasonably anticipated being able to extend the license under comparable business terms.

90.     ASG breached its duty of good faith and fair dealing by extorting HOV to obtain commercially unreasonable terms for an extension, knowing such terms were completely out of line with HOV's intended use of the Mobius System and the reasonable expectations of the parties.

91.     ASG frustrated the purpose of the License Agreement and violated the duty of good faith and fair dealing by imposing unreasonable economic terms for a renewal thereof.

92.     ASG's egregious demands were completely out of proportion with the reasonable expectations of the parties and their conduct over a 13-year relationship.  The attempt to impose a new cost structure 11 times the amount previously agreed served to evasion the benefit of the bargain anticipated by HOV.  These demands constituted an abuse of ASG's power to specify renewal terms.

93.     As a direct and proximate result of ASG's breach, HOV has suffered and will suffer monetary damages, including without limitation any amounts it agreed to pay ASG to reinstate service.

## FIFTH CAUSE OF ACTION

### (Economic Duress)

94.     HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

95.     ASG's actions in cutting off HOV and its customers from the Mobius System was a breach of the License Agreement and a threat of continuing breach unless ASG's commercially unreasonable terms were agreed to.

96.     ASG, using improper and unlawful economic duress, coerced and extorted HOV into agreeing to Exhibit E in order to ensure continued operations of the business.

97.     HOV was under economic duress, because its operations depended on the continuing connection of the Mobius System and the ability of HOV's customers to access their data.

98.     HOV's acceptance of Exhibit E was a direct result of the economic duress caused by ASG.

99.    ASG knew and intended that its actions would create economic duress such that HOV would be required to enter into Exhibit E.

100.    Accordingly, equity requires that Exhibit E be rescinded.

101.    In addition, by reason of the foregoing economic duress and coercion, ASG has been unjustly enriched and HOV has been damaged in an amount to be determined at trial.

102.    HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

## SIXTH CAUSE OF ACTION

### (Conversion)

103.    HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

104.    HOV has a right of ownership in its servers and other protected computers. Through the conduct described above, ASG exercised an unauthorized ownership or dominion of those servers and other protected computers belonging to HOV, to the exclusion of HOV's rights.  HOV did not authorize ASG to exercise such ownership or dominion.

105.    ASG has therefore converted HOV's servers and other protected computers and has interfered with HOV's access to and use of such servers and protected computers.

106.    As a direct and proximate result of such conversion, HOV has sustained monetary damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Tortious Interference)

107.    HOV repeats and realleges each and every allegation in the foregoing paragraphs as if same were set forth at length herein.

108.    HOV has valid agreements and profitable business relationships with the customers that use its services. ASG has at least general knowledge that those agreements and relationships exist, and that HOV endeavors to provide its customers with constant access to their electronic data.

109.    ASG intentionally interfered with those agreements and relationships, by shutting down the Mobius System on September 28, 2018, such that HOV's customers would not have access to their electronic data located on HOV's servers. ASG used dishonest, unfair, improper and/or wrongful means, because it was extorting HOV to agree to unjustifiable business terms and interfered with HOV's agreements and relationships for that wrongful purpose.

110.    As a direct and proximate result of ASG's tortious interference, HOV has suffered monetary damages in an amount to be determined at trial.

**WHEREFORE,** HOV demands judgment against ASG as follows:

(i)    For a declaratory judgment, pursuant to 28 U.S.C. § 2201 declaring that the actions of ASG complained of herein constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, as alleged herein;

(ii)    For injunctive relief in the form of an order temporarily, preliminarily, and/or permanently enjoining ASG from terminating Plaintiff's license for the Mobius System (as defined in the Complaint herein), from taking any steps that would inhibit the ability of Plaintiff and/or its clients to access data and documents on Plaintiff's computer systems, or from otherwise accessing to any protected computer relied upon and used by HOV, and to take reasonable steps to verify compliance with such order;

(iii)    For equitable relief rescinding Exhibit E;

(iv)    For compensatory damages in an amount to be determined at trial;

(v)    For punitive damages in an amount to be determined at trial;

(iv)    For the costs and disbursements of this action, including HOV's reasonable attorney's fees; and

(v)    For such other and further relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a Trial by Jury on all applicable issues.

Dated: New York, New York
       October 24, 2018

TARTER KRINSKY & DROGIN, LLP
*Attorneys for Plaintiff*

By: _____

    Richard C. Schoenstein
    Darnell S. Stanislaus
1350 Broadway
New York, New York 10018
(212) 216-8000
rschoenstein@tarterkrinsky.com
dstanislaus@tarterkrinsky.com

## **VERIFICATION**

STATE OF CONNECTICUT )
)ss:
COUNTY OF FAIRFIELD )

Theresa K. Mohan, being duly sworn, states under penalty of perjury:

I am the General Counsel and Secretary of Exela Technologies, the ultimate parent of HOV Services, Inc. ("HOV"), which is the named-plaintiff in the above-captioned action. I have read the foregoing Verified Complaint, know the contents thereof and the same are true to my knowledge, except those matters which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true. My belief as to those matters therein not stated upon knowledge is based upon books and records maintained by HOV, which are in my custody and control.

_Theresa K. Mohan_
Theresa K. Mohan

Sworn to before me this
23 day of October, 2018

_____
NOTARY PUBLIC

**SANDRA MARS**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JUN. 30, 2021